# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-3470

MARY SALLENGER, AS THE ADMINISTRATOR OF
THE ESTATE OF ANDREW B. SALLENGER, DECEASED,

*Plaintiff-Appellee,*

*v.*

BRIAN OAKES, JAMES ZIMMERMAN, AND
JASON OLIVER,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
Central District of Illinois.
No. 03-3093—**Jeanne E. Scott**, *Judge.*

_____

ARGUED SEPTEMBER 14, 2006—DECIDED JANUARY 10, 2007

_____

Before CUDAHY, MANION, and ROVNER, *Circuit Judges.*

CUDAHY, *Circuit Judge.* Andrew Sallenger, who suffered from mental illness, died on April 30, 2002, while the defendants were placing him under arrest. Mary Sallenger, his mother and the administrator of his estate, brought this lawsuit against the City of Springfield and the three police officers involved in this incident, among other parties, alleging a claim under 42 U.S.C. § 1983 pursuant to the Fourth Amendment's right to be free from excessive force, among other claims. The issue in this case is whether Sergeant Zimmerman, Officer Oakes and Officer

Oliver are entitled to qualified immunity. The district court determined that they were not. We agree and affirm the district court's decision to deny the individual defendants' motion for summary judgment with respect to the Fourth Amendment excessive force claim.

## I. Background

In the early morning hours of April 30, 2002, Andrew Sallenger, who was mentally ill, experienced a severe psychotic episode. That night, Andrew Sallenger was staying at the home of his mother, Mary Sallenger, the Administrator of Andrew's estate and Appellee in the present case. Ms. Sallenger's daughter Kim Nolan and her four children were also spending the night at Ms. Sallenger's home. After midnight, Andrew awakened the household with his screams and disturbing behavior. Ms. Sallenger, Ms. Nolan and Ms. Nolan's children left the home, and Ms. Nolan called 911 at 1:49 a.m.

According to the transcript of the exchange with the 911 operator, Ms. Nolan informed the operator that her brother was "completely naked and keeps on yelling at us . . . ." She asked the 911 operator to dispatch paramedics to Ms. Sallenger's home. She also notified the operator that her brother was "schizophrenic bipolar manic depressive" and that earlier in the day she had gone to the state's attorney to ask about having Andrew involuntarily committed.

Sergeant James Zimmerman, Officer Brian Oakes and Officer Jason Oliver (collectively "the officers") were immediately dispatched to Ms. Sallenger's home. They arrived shortly after 2:00 a.m. Ms. Sallenger, Ms. Nolan and Ms. Nolan's children were waiting outside of the residence when they arrived. Ms. Nolan informed the officers that her brother was mentally ill. Ms. Sallenger

told the officers that she wanted the paramedics, not the officers, to assist Andrew. Ms. Nolan informed the officers that they could enter through the back door of the residence, which was unlocked. Lastly, she told Officer Oakes that Andrew was throwing things around the house, chasing the cat and chasing the other members of the household while naked.

Sergeant Zimmerman testified that Officer Oakes informed him that Andrew had a mental problem and that he was big and strong. Officer Oliver testified that Oakes and Zimmerman mentioned a conflict Andrew had had with the Springfield Police Department ("the Department") officers a few days before on April 28, 2002. Officer Oliver also testified that one of the family members told Officer Oakes and Sergeant Zimmerman that Andrew "would probably fight [them]." Andrew and the officers were all large men. Andrew weighed 262 pounds and was approximately 6' tall. Sergeant Zimmerman was 5' 10" tall and weighed 260 pounds. Officer Oakes was 5' 10" tall and weighed 220 pounds. And Officer Oliver stood 6' 3" tall and weighed 215 pounds. Officers Oakes and Oliver were both weightlifters and could bench-press approximately 275 pounds. At the time of the incident, the Department policy was to treat all potential arrestees the same way, regardless of their mental condition. None of the officers was specifically trained in how to respond to mentally ill individuals.

The officers entered the home with Sergeant Zimmerman in the lead. Sergeant Zimmerman and Officer Oliver testified that at that time they believed they would arrest Andrew for disorderly conduct. Officer Oakes testified that he did not intend to arrest Andrew at the time they entered the house. Sergeant Zimmerman announced the officers' entrance. The officers used flashlights to navigate their way through the house, which was dark. The officers made their way to his bedroom. When they first saw

Andrew, he was sitting cross-legged on the floor of his bedroom, completely naked, with his back against the side of his bed, and his right side facing the officers. The officers could hear Andrew muttering something about colors and fishing. Sergeant Zimmerman recalled that there were no lights on in his bedroom; Officers Oliver and Oakes remembered a small bedroom lamp as being on.

Despite Sergeant Zimmerman's repeated announcements, Andrew did not appear to be aware of the officers' presence. Andrew first acknowledged them by saying, "Hey, what are you guys doing here?" According to the officers, Andrew then threw a small, white object resembling an ashtray that landed close to Sergeant Zimmerman.[1] After acknowledging the officers' presence, Andrew stood up and approached the officers, who were standing about five to six feet away from Andrew. According to Sergeant Zimmerman, Andrew stood up, swore at them, rushed at Zimmerman, grabbed his shoulder radio equipment and knocked the flashlight out of his right hand. Officer Oakes, who was behind Zimmerman, testified that Andrew swore at the officers, threatened to kill them, clenched his fists and came at them with his fists up. Officer Oliver, who was behind Oakes, testified that Andrew swore at the officers, clenched his fists, approached in a "boxing position," stopped in front of Zimmerman and started to reach for him.

At that time, Officer Oakes sprayed oleoresin capsicum (OC) spray, commonly known as pepper spray, into Andrew's face. Some of the spray also hit Zimmerman's face. Sergeant Zimmerman pushed Andrew backward, and both

---

[1] Ms. Sallenger disputes this claim based on the fact that the crime scene investigator did not find any object that met this description when he conducted a search of the bedroom after the incident.

of them fell into the bedroom with Sergeant Zimmerman on top of Andrew. Andrew then managed to turn himself onto his stomach. Officer Oakes grabbed Andrew's right arm, and Sergeant Zimmerman grabbed his left. At the same time, Officer Oakes attempted to control Andrew's legs. As Andrew tucked his arms under him, the officers struggled with Andrew to maneuver his arms behind his back so that they could handcuff him. During the struggle, the officers repeatedly told Andrew that he was under arrest and commanded him to stop resisting arrest. Andrew repeatedly told the officers to leave and threatened to kill them.

Andrew managed to bring himself up onto his hands and knees. Officer Oliver put his knee across Andrew's shoulder blades to try to push him back down on the ground. Andrew managed to lunge to the bed, lifting his torso on the bed, with his knees on the floor. All three officers followed Andrew to the bed. Andrew tucked his arms under his torso to prevent handcuffing. During the move to the bed, the lamp was knocked over. Officer Oakes testified that he threw his flashlight onto the bed to illuminate the room. Ms. Nolan testified that she saw the bedroom light go out and then witnessed what she described as a flashlight beam "moving around . . . like a hitting motion . . . ."

Soon after Andrew was on the bed, Officer Oliver and Sergeant Zimmerman were able to maneuver Andrew's arms behind his back and handcuff him. Before Andrew was handcuffed, the officers applied several types of force, which were increasingly severe, to get him to comply with their orders. First, Officer Oliver used several pressure-point techniques, which were ineffective. Sergeant Zimmerman used an armbar technique in order to maneuver Andrew's left arm into a position where handcuffs could be placed. Second, both Officer Oliver and Officer Oakes administered closed-fist blows to Andrew.

Officer Oliver struck Andrew's right shoulder two or three times. Officer Oakes struck Andrew's right common peroneal area, the site of a nerve behind the right thigh, with two sets of triple punches. Third, Officer Oakes struck Andrew with three sets of triple blows with the flashlight in Andrew's right common peroneal area.

According to the officers, despite being handcuffed, Andrew continued to struggle. He attempted to pull his hands apart, and he threatened to kill the officers unless they removed his handcuffs. Andrew also kicked Officer Oakes several times. After he was handcuffed, Officers Oakes and Oliver continued to exert additional force, beyond open-hand control, on Andrew. Officer Oliver delivered two closed-fist punches to Andrew's shoulder area and two blows with the flashlight to Andrew's upper arm. Officer Oliver testified that he thought Andrew was reaching for Oliver's duty belt. Officer Oakes delivered a fourth set of triple blows with the flashlight to Andrew's right common peroneal area. Officer Oakes testified that after this fourth set of blows Andrew "stopped kicking, stopped trying to move."

Sergeant Zimmerman left the bedroom to wash the OC spray out of his eyes. He returned to check on the situation. After hearing from Officers Oakes and Oliver that everything was all right, Sergeant Zimmerman left again to flush the OC spray from his eyes. When Sergeant Zimmerman returned again, Officer Oakes give him his car keys and asked him to retrieve the hobble he kept in his police car. A hobble is a cord that is looped around the lower legs and then connected to a strap which is attached to handcuffs.

At the time of the incident, the Department allowed, and even directed, officers to use hobbles in some situations, namely "in cases in which a prisoner is displaying or has indicated signs of a hostile and combative nature." Officer

Oakes's hobble was not issued by the Department, rather, he had purchased it from a retail website. The Department did not offer training on the use of the hobble, and none of the officers were trained in the use of a hobble, although Officer Oakes testified that he had read the instructions and had seen other officers use one. Sergeant Zimmerman testified that he knew that it was important to turn a person restrained in a hobbled position on his side "to make sure that the airway is clear and that [the arrestee] can still breathe." Officer Oakes was not aware until after the incident in question that a hobble could create a risk of positional asphyxiation.

Andrew was still on the bed, with his knees on the floor and his body in a kneeling position, when Sergeant Zimmerman returned with the hobble. Officer Oliver had his right knee on Andrew's right shoulder area, his right hand pressing on Andrew's left shoulder, and his left hand pulling up on the handcuff chain. Officer Oakes testified that he was still trying to control Andrew's feet. Sergeant Zimmerman and Officer Oakes then placed the hobble on Andrew. Officer Oakes testified that he pulled the strap connecting the leg restraint to the handcuffs tight enough so that his "toes . . . were no longer touching the ground; they were elevated, more or less . . . [and] [h]is lower legs from below his knees were . . . pointing towards his butt . . . ." After the hobble was placed, all three officers released Andrew and stepped away. Sergeant Zimmerman and Officer Oliver stated that Andrew continued to struggle.

At some point, Sergeant Zimmerman noticed that Andrew was not breathing. Sergeant Zimmerman offered a different account than Officers Oakes and Oliver as to the position of Andrew's body at this time. Sergeant Zimmerman testified that he rolled Andrew off the bed and onto his side after the hobble was placed. Officer Oakes testified that Andrew was hobbled with his torso

leaning up against the bed and that he "remained in that position" after he was hobbled. Oakes further testified that Andrew was not moved off the bed until after Sergeant Zimmerman recognized that Andrew was no longer breathing. Officer Oliver also testified that Andrew was not rolled off of the bed until after Sergeant Zimmerman asked if Andrew was still breathing. Lieutenant Mark Bridges, who arrived at the scene shortly before the officers realized Andrew was not breathing, also testified that Andrew was hobbled and leaning against the bed.

Ms. Nolan and the three defendants offered different testimony about the length of time between the hobble being placed and the discovery that Andrew was no longer breathing. Zimmerman, Oakes and Oliver all testified that the time between the hobbling and their realization that Andrew was not breathing was only a few seconds. Ms. Nolan's account challenges this timing. She stated that she witnessed Sergeant Zimmerman retrieve the hobble from Officer Oakes's police car, return with it to the residence and then come out some time later to wipe off his face. Ms. Nolan further testified that she heard Andrew scream three times. She then followed Sergeant Zimmerman back into the house and to Andrew's bedroom. She recounted that when she reached Andrew's bedroom, she turned on the overhead light and saw Andrew handcuffed and hobbled with his head and chest on the bed and his knees on the ground. Ms. Nolan then testified that she started to scream, ". . . oh my God, you killed my brother, you killed my brother." She testified that the officers did not check for Andrew's pulse until she came into the bedroom and started screaming. Officer Oakes testified that Ms. Nolan came into the bedroom after Andrew was handcuffed but before he was hobbled.

After the officers determined that Andrew was not breathing and had no pulse, they removed the hobble, and Andrew's right hand was uncuffed. At that point CPR was

administered. Andrew was transported to St. John's hospital in Springfield, Illinois. He never regained consciousness and was declared brain dead on May 1, 2002.

According to an autopsy performed by Dr. Kent Harshbarger, M.D., J.D., the cause of death was "a cardiorespiratory arrest during prone police restraint due to excited or agitated delirium. The death [was] contributed to by clinical history of mental illness, cardiomegaly [enlarged heart], fatty liver, and obesity." Dr. Harshbarger explained that "excited or agitated delirium" is characterized by "agitation, hostility, bizarre or hyperactive behavior, paranoia, shouting, thrashing, ranting and usually performing feats of exceptional strength or endurance without apparent fatigue." Dr. Harshbarger concluded that Andrew's death was "likely related to the various neurophysiologic or neurochemical stressors acting upon underlying natural disease processes as opposed to any clinically relevant reduction in oxygenation during the period of restraint." He also noted Andrew's enlarged heart, which weighed 550 grams in contrast to the normal male heart's weight of 350 grams, as a risk factor for sudden cardiac arrest. As for using prone restraint techniques, Dr. Harshbarger, testified:

> Many investigators focus on the potential for "positional asphyxia" or reduction in blood oxygenation as the underlying cause of death, however, the data to date does not confirm significant lowering of blood oxygen in healthy volunteer subjects. The test subjects do demonstrate a prolonged pulse recovery time when in the prone and "hobbled" position confirming a physiologic mechanism affecting the heart that is related only to body positioning.

After examining Andrew's physical injuries, Dr. Harshbarger concluded that "there were no injuries identified internally or externally, at the time of autopsy,

which would explain a sudden death." Dr. Harshbarger acknowledged that "the bruises [on Andrew's body] are significant . . . many of the contusions are large and of great force. Particularly in the arms, and the lateral sides of the arms, lateral sides of the thighs, exactly where they should be in someone trying to be restrained. [But] [t]hey're not lethal." Dr. Harsburger also testified that one of Andrew's head injuries was consistent with a flashlight or closed-fist blow.

Mary Sallenger filed a lawsuit against the City of Springfield, the Springfield Police Department and several members of the Springfield Police Department, including Officer Brian Oakes, Sergeant James Zimmerman and Officer Jason Oliver, in both their official capacities and as individuals.[2] Among other claims, Ms. Sallenger alleged violation of Andrew's rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983. Defendants Oakes, Zimmerman and Oliver filed a motion for summary judgment on grounds of qualified immunity. The plaintiff did not contest the individual defendants' summary judgment motion with respect to her claims under the First, Sixth and Eighth Amendments, and those claims were dismissed. The district court granted the defendants' motion for summary judgment with respect to the Fourth Amendment claim for failure to provide medical care, as well as the Fourteenth Amendment claims but denied it with respect to the Fourth Amendment excessive force claim. Therefore, the

---

[2] Claims against the Department, as well as the individual defendants in their official capacities, were dismissed with prejudice by the district court's October 8, 2003 Order. On January 28, 2005, the plaintiff voluntarily dismissed Defendant James Wangard with prejudice.

only claim relevant to this appeal is the Fourth Amendment excessive force claim pursuant to 42 U.S.C. § 1983.

## II. Discussion

*A. Jurisdiction*

Before reaching the issue of qualified immunity, there is an issue of appellate jurisdiction. The plaintiff contends that the defendants are seeking review of the district court's findings of facts, which is precluded by the collateral order doctrine.

Recognizing the urgency of denials of qualified immunity, summary judgment on these grounds is deemed a "final judgment" under 28 U.S.C. § 1291 and is immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985); *Jones v. Wilhelm*, 425 F.3d 455, 466 (7th Cir. 2005). There is an important limitation to this principle, however. Under the collateral order doctrine, the Court of Appeals may consider only issues of law and may not consider any case which raises a genuine issue of material fact on appeal. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). As the Supreme Court further explained in *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996), "determinations of evidentiary sufficiency at summary judgment are not immediately appealable merely because they happen to arise in a qualified-immunity case." However, a case is appealable when it involves "a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity, typically the issue whether the federal right allegedly infringed was 'clearly established' . . . ." *Id.* (quoting *Johnson*, 515 U.S. at 317).

In the present case, the district court determined that "there exist genuine issues of material fact as to whether the force used by Sergeant Zimmerman, Officer Oakes, and Officer Oliver was excessive." *Sallenger v. City of Springfield*, No. 03-3093, 2005 WL 2001502, *21 (C.D. Ill. Aug. 4,

2005). But, we have earlier held that a district court's finding of genuine issues of fact does not always preclude appellate review. *Leaf v. Shelnutt*, 400 F.3d 1070, 1080-81 (7th Cir. 2005); *see also McKinney v. Duplain*, 463 F.3d 679, 688 (7th Cir. 2006). "[W]hen the outcome of a question of law. . . does not depend on the outcome of a disputed factual question, we may review whether the district court correctly determined the question of law that it considered." *Leaf*, 400 F.3d at 1078. In conducting such a review, the appellate court simply adopts the facts as specified by the district court. *Id.*; *McKinney*, 463 F.3d at 688. Importantly, though, a defendant in such a case must accept the facts as found by the district court in order for us to have jurisdiction to hear the appeal. *McKinney*, 463 F.3d at 690. In other words, a defendant appealing the denial of a motion for summary judgment may only appeal this judgment if she accepts the district court's version of the facts.

Toward the end of their opening brief here, the defendants question a number of facts as found by the district court. However, they acknowledge that they are not asking this court to review the district court's version of the facts. "[W]ithout asking this Court to revisit the District Court's findings with regard to disputed material facts, the officers must take issue with some of the assumptions made by the District Court in its analysis." Appellants' Brief at 33. Moreover, in their response to the appellee's motion to dismiss, the defendants explicitly state: "It is not necessary for this Court to re-visit the facts found by the District Court in order to decide [the qualified immunity issue], nor do defendants ask the Court to do so." Appellants' Response to Appellee's Motion to Dismiss at 2. Further, the appellants conceded at oral argument that they accepted the district court's version of the facts for summary judgment purposes. Therefore, we can decide qualified immunity as a matter of law without review of

the district court's findings of facts. The appellee's motion to dismiss for lack of jurisdiction is therefore denied.

*B. Qualified Immunity*

We review a district court's denial of summary judgment de novo. *Leaf*, 400 F.3d at 1077-78. Summary judgment should be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence and all inferences that reasonably can be drawn from the evidence are construed in the light most favorable to the non-moving party, here, the plaintiff. *Leaf*, 400 F.3d at 1078.

Governmental actors performing discretionary functions are entitled to qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court articulated a two-part inquiry to determine whether a government actor is entitled to qualified immunity. First, the plaintiff must present evidence that, taken in the light most favorable to the plaintiff, would allow a reasonable fact finder to determine that he has been deprived of a constitutional right. *Id.* at 201. If the plaintiff meets that burden, we must determine whether the particular constitutional right was clearly established at the time of the alleged violation. *Id.* If the right was clearly established, the government actor is *not* entitled to qualified immunity.

Here, with respect to the first part of the inquiry, the plaintiff alleges that Andrew's Fourth Amendment right to

be free from unreasonable seizures was violated. This claim must be analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 397 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citations and quotation marks omitted). This analysis is "not capable of precise definition or mechanical application." *Id.*

To determine whether the force used to effect a seizure is unreasonable, we much examine the "totality of the circumstances" surrounding the incident. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997). "[T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" are specific factors for courts to consider. *Graham*, 490 U.S. at 396. Pertinent to this case, we have previously held that mental illness may also be relevant to the reasonableness inquiry. *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir. 2005). Importantly, all of these facts and circumstances "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Viewing the facts in the light most favorable to the plaintiff for summary judgment purposes, the district court determined the facts involving the officers' use of force to be as follows:

> [T]he evidence is that the officers delivered repeated, closed-fist blows and blows with flashlights to the back of Andrew's shoulders and thighs after Andrew was

handcuffed, that the officers continued to strike Andrew and hobbled him after he had stopped trying to kick or move, and that the officers did not immediately put him on his side, to assist his breathing, after hobbling him.

*Sallenger*, 2005 WL 2001502, at *21. Given these facts, the district court concluded that the officers' use of force was objectively unreasonable, and therefore, Andrew's right to be free from unreasonable seizure under the Fourteenth Amendment had been violated. We agree.

We focus on the force exerted by the officers in attempting to place Andrew under arrest. First, the officers "delivered repeated, closed-fist blows and blows with flashlights to the back of Andrew's shoulders and thighs *after* Andrew was handcuffed." *Id.* (emphasis added). The officers do not deny this use of force. Both Officer Oakes and Office Oliver provided testimony that they administered punches and blows after Andrew had been handcuffed. *Cf. Estate of Phillips*, 123 F.3d at 593 (granting qualified immunity by relying, in part, on the fact that "the officers did not punch, slap, kick or otherwise deliver a blow to the [arrestee's] body"). Although the defendants deny any strikes to Andrew's head, the medical evidence suggests that Andrew's head injuries were consistent with a flashlight or closed-fist blow. This blow may constitute deadly force which is unreasonable unless "the suspect threatens the officers with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm . . . ." *Garner*, 471 U.S. at 11; *see also Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988). Andrew did not threaten the officers with a weapon, nor was there probable cause to believe that he had committed a crime involving serious physical harm.

Moreover, Sergeant Zimmerman testified that after Andrew was handcuffed, he left Andrew's bedroom on two

occasions to wash out the pepper spray from his eyes. Zimmerman's departure from the bedroom raises a question of fact as to the degree of control Officer Oakes and Officer Oliver had over Andrew after he was handcuffed. His ability to leave the bedroom suggests that Officer Oliver and Officer Oakes had sufficient control over Andrew at that time to render the additional punches and blows unnecessary, and therefore, unreasonable. Although closed-fist blows and blows with the flashlight may have been necessary at first, this does not mean that this force was still justified after the handcuffs had been secured. *See Frazell v. Flanigan*, 102 F.3d 877, 885 (7th Cir. 1996) (determining that degree of force justified earlier in the encounter was not justified after arrestee was restrained), *overruled on other grounds by McNair v. Coffey*, 279 F.3d 463 (7th Cir. 2002); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (concluding that officer may have been justified in shooting arrestee when bag was thrown at him but not after it had landed at his feet).

Second, "the officers continued to strike Andrew and hobbled him after he had stopped trying to kick or move." Officer Oakes provided conflicting testimony as to Andrew's movements before and after the placement of the hobble. Although he first testified that Andrew stopped moving after the fourth set of flashlight blows, he later testified, consistent with that of Officer Oliver and Sergeant Zimmerman, that Andrew continued to struggle during and after the placement of the hobble. This inconsistency raises a genuine issue of material fact as to the reasonableness of the placement of the hobble and continued strikes. Depending on the circumstances, hobbling an individual after he had ceased resisting arrest could be objectively unreasonable. Moreover, continued punches and flashlight blows *after* Andrew had stopped moving is also objectively unreasonable. *See Frazell*, 102

F.3d at 885 (noting that "it is one thing to use force in subduing a potentially dangerous or violent suspect, and quite another to proceed to gratuitously beat him").

And, third, "the officers did not immediately put him on his side, to assist his breathing, after hobbling him." The testimony from the officers as to this third fact relied on by the district court is also conflicting. Officers Oakes and Oliver, as well as a third police officer who arrived at the scene shortly after the defendants realized Andrew was not breathing, all testified that Andrew was hobbled, leaning against the bed. Only Sergeant Zimmerman testified that he had rolled Andrew off the bed and positioned him on his side after placing the hobble. Failing to place Andrew in the proper position after hobbling him, especially in light of the evidence that Andrew had stopped moving at the time of the hobbling, could be deemed excessive by a jury. *Cf. Estate of Phillips*, 123 F.3d at 594 (noting that the officers did not "hog-tie" the arrestee-defendant when they restrained him in a prone position).

In combination, if not separately, these three facts are sufficient to allow a reasonable fact finder to determine that the force exerted by the officers was objectively unreasonable, thereby depriving Andrew of his Fourth Amendment right to be free from unreasonable seizure.

We must now determine whether Andrew's right to be free from the excessive force exerted by the officers was "clearly established" at the time of the incident. If the right was *not* clearly established, the officers are still entitled to qualified immunity.

> To be "clearly established," the right in question must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say

that in the light of pre-existing law the unlawfulness must be apparent."

*Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The officers argue that the use of the hobble was not clearly established as unconstitutional since there are no cases from this circuit which have called the use of hobbles into question. Moreover, the defendants cite authority from our sister circuits holding that the use of a hobble was not clearly established as constitutionally infirm so as to deny police officers qualified immunity. *See, e.g.*, *Garrett v. Athens-Clarke County*, 378 F.3d 1274 (11th Cir. 2004); *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001).

Although the cases relied on by the defendants do suggest that the mere use of a hobble was not clearly established as constitutionally suspect, this does not speak to the totality of circumstances surrounding the use of the hobble on Andrew. Here, the alleged excessive force does not solely, or perhaps even primarily, involve the use of the hobble. Rather, here, the officers repeatedly struck Andrew with closed-fist blows and blows with a flashlight after he was handcuffed; they continued to strike him after he had stopped moving and placed him in a hobble; and, they failed to put him immediately on his side after they hobbled him. The question is not whether Andrew's right to be free from the officers' use of the hobble was clearly established; rather, the issue is whether Andrew's right to be free from the whole range of excessive force as described by the district court was clearly established.

In the first part of our inquiry, we determined that the officers' use of force was objectively unreasonable. We further conclude that Andrew's right to be free from the excessive force inflicted on him by the officers was "sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Jones*, 444

F.3d at 934; *see also Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (holding that a showing that force was "so plainly excessive" is sufficient to meet the clearly established requirement). Viewing the facts in the light most favorable to the plaintiff, a reasonable officer would have known that administering closed-fist punches and flashlight blows, including ones to the head, after the arrestee was handcuffed, continuing to strike him after he had stopped resisting arrest and failing to place him in the proper position after hobbling him violated the individual's Fourth Amendment right to be free from excessive force.[3] Accordingly, the officers are not entitled to qualified immunity.

"[S]ince the *Graham* reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.'"*Abdullahi*, 423 F.3d at 773 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). A jury

---

[3] Placing an individual in a hobble after he has stopped resisting arrest could also constitute a Fourth Amendment violation depending on the circumstances. *See Cruz v. City of Laramie*, 239 F.3d 1183, 1189 (10th Cir. 2001) (holding that "the fourth amendment protection against excessive force includes the protection of an individual's right to be free from a hog-tie restraint in situations such as the one confronting the officers herein"). *But see Mayard v. Hopwood*, 105 F.3d 1226, 1228 (8th Cir. 1997) (holding that the force used to take the plaintiff into custody and place her in the squad car, which included hobbling her, was objectively reasonable); *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1280-81 (11th Cir. 2004) (holding that officers' use of the hobble was not objectively unreasonable when they "took advantage of a window of opportunity" in hobbling the arrestee after pepper spray caused him to become compliant).

may ultimately decide that the force exerted by Sergeant Zimmerman, Officer Oakes and Officer Oliver was reasonable, but this is for the jury to decide, not us. *See Ellis*, 999 F.2d at 247.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of the defendants' motion for summary judgment.

A true Copy:

       Teste:

           _____
           *Clerk of the United States Court of*
           *Appeals for the Seventh Circuit*