FILED
United States Court of Appeals
Tenth Circuit

June 17, 2009

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

TRACEY CORDOVA, MORGAN
DOUTHWIT and DIVINITY
CORDOVA,

       Plaintiffs-Appellants,

    v.

DEREK ARAGON and CITY OF
COMMERCE CITY,

       Defendants-Appellees.

No. 08-1222

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 07-CV-879-EWN-CBS)**

Brice A. Tondre, Lakewood, Colorado, for Plaintiffs-Appellants.

Thomas S. Rice (Elliot J. Scott with him on the brief), Senter Goldfarb & Rice,
L.L.C., Denver, Colorado, for Defendants-Appellees.

Before **O'BRIEN**, **ANDERSON** and **McCONNELL** Circuit Judges.

**McCONNELL**, Circuit Judge.

    Toby Cordova was shot and killed while fleeing from police in an early-

morning car chase in Commerce City, Colorado.  His survivors brought this 42

U.S.C. § 1983 action against Officer Derek Aragon and Commerce City, alleging that Officer Aragon had violated Mr. Cordova's Fourth Amendment rights by using excessive force to end the police chase. Officer Aragon asserted qualified immunity and the defendants filed a motion for summary judgment. The district court granted their motion, holding that even when viewed in the light most favorable to the Cordovas the facts did not constitute excessive force. We disagree that the facts could not constitute a constitutional violation. We affirm the grant of summary judgment to Officer Aragon, however, on the grounds that the law was not clearly established, and also affirm as to Commerce City on the grounds that the Cordovas have not created a genuine issue of material fact as to whether a policy or custom of the city was the moving force behind any violation that might have occurred.

## I. Background

The parties dispute a number of facts. Because the case was decided on summary judgement, we construe these facts in the light most favorable to the non-moving party—here, the Cordovas.

On May 3, 2006, at 12:58 A.M., Officer James Zamora of the Commerce City Police Department ("CCPD") spotted a truck driving in a subdivision where several new homes were being built. The truck was pulling a skid-steer loader (a piece of heavy excavation equipment) on a trailer behind it. Officer Zamora found this suspicious, as a number of thefts from construction sites had recently

been reported in the area. He ran the trailer's license plate and determined that it was not registered to an address in the vicinity. The skid-steer loader was later determined to be stolen. Officer Zamora attempted to pull over the truck, but the driver—Mr. Cordova—refused to stop and ran through a solid red light. At this point, the pursuit began.

When the police radio announced that Officer Zamora was attempting to stop a suspicious vehicle, Officers Derek Aragon, Dax Nance, and Janae Rubino headed toward his location. The officers attempted to corner Mr. Cordova after he pulled into a business parking lot, but Mr. Cordova evaded capture by driving straight at them. Officer Rubino announced over the radio that the truck had attempted to ram her and that she had made an evasive turn to avoid being hit.

The pursuit continued, now moving beyond the parking lot and involving multiple police cars with lights and sirens in action. During the pursuit, Mr. Cordova twice drove off the road to avoid spike strips, once more ran a red light, repeatedly refused to stop for patrol cars with lights and sirens activated, and generally proceeded at speeds between 30 and 50 miles per hour. He eventually turned onto eastbound I-76. Officer Aragon became concerned that Mr. Cordova might cross over to the wrong side of the highway in an attempt to escalate the danger of the pursuit and avoid apprehension. He decided to cross onto the wrong side of the highway himself so that he could "warn traffic of the potential

danger." Dist Op. 6.[1] Mr. Cordova then crossed onto the wrong side of the highway, too. Officer Aragon slowed his patrol car, at which point Mr. Cordova tried to ram it, according to statements by both Officer Aragon and Officer Nance, who was riding in Officer Aragon's car. Officer Aragon then accelerated past the truck, stopped his car, and attempted to deploy stop sticks. Although the car's exact position is not known because Officer Nance later moved it, Officer Aragon testified that he positioned it sideways so as to force Mr. Cordova either to move back across the highway into the proper lanes or to exit the highway via an on-ramp.

Both officers exited the police car, with Officer Nance positioned at the median in the center of the highway and Officer Aragon closer to the side. At this point there are key differences in each side's version of the story. Officer Nance says that the truck appeared to be heading in his direction, so he drew his gun and pointed it at the truck. He claims that the truck then swerved left, away from him and toward Officer Aragon. Officer Aragon says that he then attempted to deploy the stop sticks, but quickly realized the truck was too close. He drew his gun. He claims that he was in immediate danger, about to be run over, and therefore rapidly fired at the vehicle while simultaneously trying to move out of

---

[1]The district court found that a reasonable juror could consider this decision to cross the median to have been reckless.

the way. He fired either four or five shots, one of which hit Mr. Cordova in the back of the head, fatally wounding him and causing the truck to crash into a tree.

Several of the facts cast doubt on Officer Aragon's claims of immediate danger, however. Only one bullet hit the front of the truck; the rest hit the side. The fatal shot, in fact, entered the truck from the side and went through the back of Mr. Cordova's head. This strongly suggests that Mr. Cordova had turned the truck and was no longer bearing down upon Officer Aragon at the moment the officer fired the fatal shot. The Cordovas also contend that Officer Aragon was never in any immediate danger in the first place and that he could have easily avoided any and all risk by simply remaining behind his patrol car as the truck approached. Furthermore, they suggest that it was Officer Aragon's own attempt to deploy the stop sticks in the truck's only path of escape—a maneuver that might have violated CCPD policies—that created whatever danger might have existed. In short, it is not at all clear whether Officer Aragon was ever in any immediate danger at any point during the chase, and it in fact seems quite likely that whatever danger he might have perceived had passed by the time he fired the fatal shot.

Given these facts, the district court agreed with the Cordovas that a reasonable juror could find that Officer Aragon fired the fatal shots at a point when Mr. Cordova posed no immediate danger to the officers' safety, and that Officer Aragon's own actions had recklessly contributed to a situation where he

perceived a need to shoot Mr. Cordova. Even so, the district court held that the sheer danger demonstrated by Mr. Cordova, who had persisted in a car chase in which he had repeatedly refused to stop, had run through at least two red lights, had driven off the road at least twice to avoid the deployment of stop sticks, had allegedly attempted to ram multiple officers' patrol cars, and who was now towing a large piece of machinery on the wrong way down a highway at one in the morning, justified a reasonable officer in using deadly force to terminate the chase. Finding no Fourth Amendment violation, the district court granted the defendants' motion for summary judgment.

On appeal, Officer Aragon and Commerce City do not challenge the factual assumptions the district court made when granting summary judgment—that is, they accept the district court's premise that Officer Aragon was not in immediate danger and that no innocent bystanders were in the vicinity. *See* Aple. Br. 2 ("Officer Aragon and the City assume, for purposes of appeal, the factual determinations made by the lower Court."). Like the district court, they focus instead on what is undisputed: that "Cordova had fled a lawful stop, attempted to ram multiple police vehicles, run two red lights, and had begun driving the wrong way down an interstate highway," thereby "endanger[ing] innocent motorists and police officers," and argue that because of this the shooting was reasonable. Aple. Br. 26. For this reason, we accept the district court's findings that a reasonable juror could find that Officer Aragon was not in immediate danger at

the time of the shooting, and we ask only whether the potential risk to third parties created by Mr. Cordova's driving was alone sufficient to justify Officer Aragon's shooting him.

## II. Discussion

## A.  Did the Use of Force Constitute a Constitutional Violation?

A Fourth Amendment claim of excessive force is analyzed under the "objective reasonableness" standard that governs other Fourth Amendment inquiries.  *See Graham v. Connor*, 490 U.S. 386, 395 (1989) ("[A]*ll* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.").  We thus ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  Reasonableness "must be judged from the perspective of a reasonable officer on the scene," who is "often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–397.

There is no easy-to-apply legal test for whether an officer's use of deadly force is excessive; instead, we must "slosh our way through the fact-bound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007).  This

sloshing requires us to weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* Some of the factors that we have found useful when conducting this balancing act include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Weigel v. Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008) (citation omitted). Additionally, we have considered "whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001) (citation omitted). Once the relevant facts are determined with all reasonable inferences drawn in favor of the non-moving party at the summary judgment stage, "whether [the suspect's] actions have risen to a level warranting deadly force . . . is a pure question of law." *Scott*, 550 U.S. at 381 n.8.

The Supreme Court recently applied this balancing approach in *Scott v. Harris*, where the Court had "little difficulty in concluding" that an officer had acted reasonably when he terminated a car chase by ramming the bumper of the fleeing car. *Id.* at 384. On one side of the scale, the suspect "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase," and had also demonstrated his own culpability by "unlawfully engaging in the reckless, high-

speed flight that ultimately produced the choice between two evils that [the officer] confronted." *Id.* On the other side of the scale was the life of the suspect and the fact that the ramming "posed a high likelihood of serious injury or death to" the suspect. *Id.* Faced with the apparent equipoise of "the perhaps lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person," *id.*, the Court found that the culpability of the suspect and innocence of the bystanders and officers tipped the balance in favor of reasonableness.

Importantly, though, while the threat to the suspect in *Scott* posed a "high likelihood" of serious injury or death, it did "not [pose] the near *certainty* of death posed by, say, shooting a fleeing felon in the back of the head, or pulling alongside a fleeing motorist's car and shooting the motorist." *Id.* (internal citations omitted). "A police car's bumping a fleeing car is, in fact, not much like a policeman's shooting a gun so as to hit a person." *Id.* at 383 (quoting *Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d 1563, 1577 (11th Cir. 1992) (Edmondson, J., dissenting), adopted by 998 F.2d 923 (11th Cir. 1993) (en banc) (per curiam)). The Court highlighted the difference with a comparison to *Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003), a case that involved the "near certainty" of serious injury or death. In *Vaughan*, the officers allegedly drove alongside a fleeing truck and ended the flight by shooting three rounds into the truck without warning. *Id.* at 1327. The Eleventh Circuit found that if the jury

believed this version of the facts, the shooting could constitute excessive force. *Id.* at 1332.

When discussing excessive force, we sometimes use the term "deadly force" as if it is a unitary concept. *See, e.g.*, *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) ("Defendants' use of deadly force was justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."). As *Scott* makes clear, however, the term encompasses a range of applications of force, some more certain to cause death than others. It includes force that is "likely" to cause serious injury or death, such as ramming, and also includes force that is nearly certain to cause death, such as a shot to the head. *Scott* strongly suggests that the reasonableness balancing must take into account that there is a spectrum of "deadly force," and that just because a situation justifies ramming does not mean it will justify shooting a suspect in the head.

This is not a case of ramming. Officer Aragon shot Mr. Cordova in the back of the head while he was driving—an application of force closer to that in *Vaughan* than to that in *Scott*. But there are other differences that cut the other way. The motorist in *Vaughan* was exceeding the speed limit by ten miles per hour and attempting to evade the police, but he remained in his lane of traffic and did not engage in highly reckless maneuvers. *Id.* at 1330. Mr. Cordova's

behavior—towing a large piece of machinery down the wrong way of a highway in the dark, and employing evasive maneuvers such as running red lights, driving off the road, and attempting to ram police cars—posed a much greater risk to police and innocent bystanders. Because there were no other motorists in the immediate vicinity, however, this risk was presumably less "imminent" than that posed by the driver in *Scott*. *Cf. Scott*, 550 U.S. at 379 (describing how the suspect "swerve[d] around more than a dozen other cars, cross[ed] the double-yellow line, and force[d] cars traveling in both directions to their respective shoulders to avoid being hit"). In this respect, the case falls somewhere in between *Scott* and *Vaughan*. We are therefore forced to consider whether the substantial but not imminent risk imposed on innocent bystanders and police by a motorist's reckless driving justifies a reasonable officer to use a level of force that is nearly certain to cause the motorist's death. This is not an easy question, or one that any court could feel confident in answering.

This court has stated that "[w]here an officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force," *Weigel*, 544 F.3d at 1152 (quoting *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003)), but that statement must not be read too broadly. It does not mean that any risk of physical harm to others, no matter how slight, would justify any application of force, no matter how certain to cause death. The Supreme

Court's careful distinction of *Vaughan* in *Scott* belies that sweeping a proposition. We do not believe it would be reasonable for an officer to shoot any motorist who ran a red light or swerved through lanes, simply because reckless driving poses some threat of physical harm to a bystander who might be down the road. Car chases inherently risk injury to persons who might happen along their course, and if that risk alone could justify shooting the suspect, every chase would end much more quickly with a swiftly-fired bullet. We do not mean to minimize that risk, or suggest that the risk to others must always be imminent in order to justify the use of deadly force, *cf. Scott*, 127 S. Ct. at 1778 (use of deadly force, though not of a level nearly certain to cause death, justified by "threat to lives of any pedestrians who *might* have been present") (emphasis added), but "the Court's decision in *Scott* did not declare open season on suspects fleeing in motor vehicles." *Lytle v. Bexar County*, 560 F.3d 404, 414 (5th Cir. 2009). When an officer employs such a level of force that death is nearly certain, he must do so based on more than the general dangers posed by reckless driving.

To the extent that the district court held that the hypothetical risk Mr. Cordova posed to fellow motorists who might happen along was itself enough to render the shooting reasonable, it was in error. The threat must have been more than a mere possibility. The facts show that Mr. Cordova was driving recklessly down the wrong side of the highway. The facts do not, however, show that any other motorists were in the vicinity, or that other motorists would not be able to

-12-

spot Mr. Cordova and avoid an accident themselves. Mr. Cordova's behavior did, of course, create risks for other motorists who might come along, but that risk of future harm was not enough to justify the near certainty of Mr. Cordova's death.

The threat to the officers themselves—if actual and imminent—could of course shift the calculus in the direction of reasonableness. If a reasonable officer in Officer Aragon's position would have feared for his life or the life of his fellow officers, then on one side of the scales would sit not only the potential (even if distant) risk to any motorist who might wander along, but also the very immediate risk of death to the pursuing officers. The urgency of terminating the chase would increase and the balance would tip in the officers' favor. The use of deadly force—even of the level nearly certain to cause death—would likely be justified. Here, however, the threat to the officers is a disputed fact, and for purposes of the summary judgment motion the district court explicitly assumed the officers to be in no immediate danger.

It is with reluctance that we second-guess the split-second decisions of trained officers reacting to difficult situations in the line of duty. We are not well-suited to act as a police supervisory board, making finely calibrated determinations of just what type of misbehavior justifies just what level of response. We cannot say, however, that the general risks created by a motorist's fleeing from the police are, without more, enough to justify a shooting that is nearly certain to cause that suspect's death.

Our esteemed colleague in dissent criticizes us for not delving more deeply into the record and instead accepting the district court's construction of the undisputed facts of this case. But the dissent rests entirely on parts of the record the parties have not cited in their briefs, and in some cases on arguments they have expressly disavowed. It is not our role to sift through the record to find evidence not cited by the parties to support arguments they have not made. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir.1995) ("Without a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury." (internal quotation omitted)); *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n. 7 (10th Cir.1994) (if a party does not raise an argument in its opening brief, the argument is waived).

In support of its claim that Officer Aragon was indisputably in imminent danger, the dissent argues that the district court "went overboard" in construing the facts favorably to the nonmoving party, Dissent at 9 n.13, and criticizes us for "[w]ith no analysis . . . accept[ing] [the] assumption" that Officer Aragon was not in immediate danger. *Id.* at 9. Officer Aragon and Commerce City have not contested the district court's assumptions, though, and indeed have expressly stated that "Officer Aragon and the City assume, for purposes of appeal, the

factual determinations made by the lower Court." Aple. Br. 2.[2]  Perhaps the dissent would have litigated the appeal differently, but the defendants' decision not to challenge the district court's analysis of the facts bearing on Officer Aragon's danger constitutes a waiver.  *Mhoon*, 31 F.3d at 984 n. 7.

Even aside from waiver, the undisputed fact that at least some of the shots hit the truck from the side, showing that the truck was no longer bearing down on Officer Aragon, and the testimony of a Commerce City police officer that "one trained in the use of that pistol in tactical shoot/no shoot scenarios would have no difficulty ceasing firing when the danger ceased," Aple. Br. 18, suggest that a reasonable jury could disagree with the dissent's confident determination that Officer Aragon was indisputably in immediate danger when he fired the fatal shot.

In support of its view that Mr. Cordova's conduct posed an imminent danger to innocent motorists, the dissent challenges the district court's conclusion that the record did not clearly show that other vehicles were in the vicinity.  The dissent relies on a statement in Officer Aragon's affidavit—referred to in neither party's brief—that he had seen "three or four cars."  Dissent at 19.  But again, this was an issue the defendants explicitly chose not to contest.  They state:

---

[2]  Because this case was decided on summary judgment, the district court did not make any true "factual determinations," but it carefully set forth its understanding of which facts were undisputed.  It is to these determinations the appellees are referring.

-15-

"Plaintiffs also claim that the District Court's conclusion that 'no evidence suggests that westbound traffic was immediately approaching when Officer Aragon fired' effectively 'rules out danger to innocent motorists.' . . . *Whether or not there were vehicles visible in the immediate area*, there is no question that Cordova's flight posed enormous danger to motorists and police officers." Aple. Br. 23–24. In other words, rather than claim that the record indisputably shows that other vehicles were visible in the immediate area, the defendants accept that this is a disputed factual issue and argue that the danger was "enormous" under either version of the facts. When even the defendants treat as an open question whether there were vehicles visible in the immediate area, we cannot join the dissent in treating the contrary as an undisputed fact.

Perhaps defense counsel would have been able to persuade a jury that the danger to Officer Aragon or to the public was indeed imminent, as the dissent believes, but that is not the issue. We do not hold that "Aragon's conduct in shooting Cordova was unreasonable," as the dissent asserts, Dissent at 8, but hold only that the contrary has not been established as a matter of law, based on the undisputed facts in the record and in light of the parties' arguments on appeal.

## B. Was the Law Clearly Established?

Even if Mr. Cordova's Fourth Amendment rights were violated, Officer Aragon is still entitled to qualified immunity if the right was not clearly established. *See Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th

-16-

Cir. 2009). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Weigel*, 544 F.3d at 1153 (quoting *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir. 2001)). When a clearly established right depends on the application of a general principle of law to a particular set of facts, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 1154 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

There is no question that the general principle governing the use of force is clearly established: deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others. *See Graham*, 490 U.S. at 396; *Sevier*, 60 F.3d at 699; *Wilson v. Meeks*, 52 F.3d 1547, 1552–53 (10th Cir. 1995). What Officer Aragon contests is whether a reasonable officer should have known that this general principle prevented him, in this case, from ending the car chase by shooting Mr. Cordova. Not every constitutional principle that involves a balancing test requires that the precise factors involved in the present case have previously been quantified and weighed, of course. The Supreme Court has "expressly rejected a requirement that previous cases be 'fundamentally similar'" in order for the law to be clearly established, *Hope v. Pelzer*, 536 U.S. 730, 741

-17-

(2002), and has held that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). In this case, however, substantial differences from prior case law convince us that the result of the balancing test had not been clearly established.

Two of the inputs into the balancing equation have particular importance in this case: the level of force used by the officer and the degree of risk posed to innocent bystanders. In *Scott v. Harris*, the risk to potential third parties was substantial, but the risk to the suspect, while high, was not certain to cause death. The Court found no constitutional violation. *See also Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (officers aiming at engine, rather than driver, of semi truck in high-speed chase on crowded interstate did not act unreasonably, though the driver was hit). In *Vaughan*, in contrast, the risk to the suspect was high and death nearly certain, but the risk to third parties was insubstantial. There, the court found a constitutional violation. *See also Tennessee v. Garner*, 471 U.S. 1, 11 ("shooting *nondangerous* fleeing suspects is [not] so vital as to outweigh the suspect's interest in his own life") (emphasis added); *Smith v. Cupp*, 430 F.3d 766, 773 (6th Cir. 2005) (driving a stolen police car did not by itself pose a grave enough danger to the public to justify shooting). Our case is a hybrid—the risk to potential third parties was as substantial, but less imminent, as in *Scott* and the

-18-

level of force was nearly certain to cause the death of the suspect. Whether that situation is more like the police using deadly force (but not of a level certain to cause death) to prevent a substantial risk of harm to others, or more like the police shooting a suspect who poses minimal risk of harm to others, is not immediately clear. Officer Aragon was confronted with a situation that fell between these two lines of cases, and the result was uncertain.

In *Lytle v. Bexar County*, the Fifth Circuit recently addressed a case similar to ours. That court concluded that the general principle governing excessive force was sufficiently well-established that a reasonable officer would have known that "it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." 560 F.3d at 417. While this general principle is correct, it still begs the question of what constitutes a *sufficient* threat. In *Lytle*, the police shot at a fleeing Taurus which posed "some threat of harm." *Id.* at 415. That threat, however, consisted of driving at high speeds through a residential area. While that level of threat might be obviously insufficient, it does not compare to the threat posed by Mr. Cordova, who was making evasive maneuvers while driving with extreme recklessness down the wrong way of a highway at night. *Lytle* is closer to *Vaughan*, where the certainty of the suspect's death was weighed against the smaller risk of harm to the general public. It does not resolve how the reasonableness calculus should

come out in the situation faced by Officer Aragon, where the risk of death is certain *and* the risk to third parties is substantial.

"The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, --- U.S. ---, 129 S.Ct. 808, 823 (2009). The law in our circuit and elsewhere has been vague on whether the potential risk to unknown third parties is sufficient to justify the use of force nearly certain to cause death. Given that our precedent does authorize the use of deadly force when a fleeing suspect poses a threat of serious harm to others, Officer Aragon was not unreasonable in believing that a potential threat to third parties would justify such a level of force.

## C. Municipal Liability

Though we hold that Officer Aragon is shielded from liability on the grounds that, even if a constitutional violation occurred, the law was not clearly established, the same qualified immunity analysis does not apply to municipalities. *See Christensen*, 554 F.3d at 1278. To succeed in a § 1983 claim against a municipality, a plaintiff must show two elements: "(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation." *Walker v. City of Orem*, 451 F.3d 1139, 1152 (10th Cir. 2006) (internal citation omitted). As discussed above, we have found a genuine issue of material fact as to whether

a constitutional violation occurred such that we cannot dispose of that issue on summary judgment. We must therefore remand for the district court to consider the City of Commerce's liability unless we find that the Cordovas have failed to create a genuine issue of material fact as to whether a municipal policy or custom was the moving force behind the constitutional deprivation.

A municipality is not liable for the constitutional violations of its employees simply because such a violation has occurred; a policy or custom must have actually caused that violation. *See Christensen*, 554 F.3d at 1279 ("The doctrine of *respondeat superior* cannot be employed to hold governmental entities liable under § 1983 for the constitutional torts of their employees."); *cf. Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008) (supervisor status alone insufficient to establish affirmative link between defendant and constitutional violation). The Cordovas admit that Commerce City's official policy, which authorizes officers to use deadly force only "in protection of themselves or other persons from the immediate threat of death or serious bodily injury," Dist. Op. 16 (citing CCPD Policy and Procedures Manual § 2.1.11), mirrors the constitutional standard. Aple. Br. 32. Their claim is that the city's actions deviated from this policy both in its training of officers and in failing to discipline Officer Aragon for his conduct.

As for any failure to discipline Officer Aragon, basic principals of linear time prevent us from seeing how conduct that occurs *after* the alleged violation

-21-

could have somehow caused that violation. A subsequent cover-up might provide circumstantial evidence that the city viewed the policy as a policy in name only and routinely encouraged contrary behavior, *see, e.g. Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) ("The disposition of the policymaker may be inferred from his conduct after the [violation occurred]."), though that hardly seems to be the case here, since the County Critical Incident Team conducted a full investigation and the CCPD police chief simply called off a second investigation as being unnecessarily duplicative. A failure to investigate or reprimand might also cause a future violation by sending a message to officers that such behavior is tolerated. It does not, however, in and of itself constitute a causal connection in the immediate case.

If the city promulgates a constitutional policy but trains its officers to violate that policy, however, a facially constitutional policy will not shield the city from liability and a causal connection could be established. The Cordovas point to only two statements, both made by Sergeant Robert McCoy, testifying as spokesman for the city, which they contend show a definite disregard for the city policy. First, when asked to describe when officers are taught they can apply deadly force, Sergeant McCoy said the suspect would have to have shown "the ability to commit an act against somebody" who was "actually in jeopardy or can be foreseen [to be] in jeopardy," and that the suspect had "the opportunity to cause the harm to that person." App. 434. Then, when asked if the word

-22-

"immediate" as it appears in the policy actually meant "imminent," he said he would agree. *Id.* 434–35. This is not the smoking gun the Cordovas make it out to be. First of all, as *Scott v. Harris* shows, the constitution permits deadly force even when the dangers to third parties are remote. It is that subcategory of force nearly certain to cause death that requires a more immediate threat. Even as applied to the specific case of shooting at a suspect, though, Sergeant McCoy's agreeing that "immediate" and "imminent" mean the same thing does not strike us as a matter of constitutional significance. The point is that the threat to another has to be real and concrete in order to justify taking the suspect's life, and Sergeant McCoy interprets both the words "immediate" and "imminent" as meaning "'Right here, right now,'" App. 435, a meaning perfectly consistent with the constitutional standard.

The Cordovas also point to a second portion of Sergeant McCoy's testimony where he discusses the specific question of when an officer can shoot at fleeing suspects:

> A. [Sgt. McCoy]. If you believe that the person is a danger to other officers and the public based upon the actions that they've done.
> Q. Does it have to be immediate danger, or can it just be some danger in the far distant future?
> A. I believe if the actions are such that he's—he or she's shown the propensity of doing that violence to the point of trying to hurt someone, kill someone, that you can stop that threat to the public, and it doesn't have to be immediate.
> Q. And that's the policy of the Commerce City Police Department, correct?
> A. Yes, sir.

-23-

App. 379. Again, though, the Cordovas make more of this statement than it supports. Sergeant McCoy does not say that officers can shoot at any fleeing suspect who poses some general danger to the public. Instead, after being pressed repeatedly on the question of whether an officer might *ever* be justified in shooting, he concedes that there are some instances that might warrant it, as when a suspect has "shown the propensity of doing that violence to the point of trying to hurt someone, kill someone." There is a difference between a suspect who is fleeing in an attempt to kill someone and a suspect whose reckless flight risks killing someone. The former suspect would pose a real and concrete threat to an innocent party, even though that threat might not materialize within the course of the chase; the latter's danger is much more speculative. Had Mr. Cordova been a serial killer whose escape would be nearly certain to result in future victims, we have no doubt the constitutional calculus would change and a shooting might be justified, whether other motorists were in his path or not.

It bears emphasizing that the constitutional standard that we elaborate upon today is hardly a mathematical formula with easily defined lines. We do not hold that an officer would never be justified in shooting a fleeing suspect, and Sergeant McCoy's reluctance to frame Commerce City's policy in such absolute terms shows why: policemen encounter a variety of unexpected situations that pose a range of dangers to the public they are sworn to protect. We hold simply that a distant risk to hypothetical motorists posed by a suspect's reckless driving

does not alone justify shooting that suspect. Commerce City's policy, neither as written nor as described by Sergeant McCoy, does not teach otherwise.

### III. Conclusion

When construed in the light most favorable to the non-moving party, the facts show that Officer Aragon used a level of force nearly certain to cause Mr. Cordova's death, though without any immediate threat to himself or others. Those facts, if true, would constitute a violation of Mr. Cordova's Fourth Amendment right to be free from unreasonable seizure. Because the law was not clear on how high the risk of harm to third parties must be before an officer can use a level of force nearly certain to cause death, however, we **AFFIRM** on qualified immunity grounds the district court's grant of summary judgment as it applies to Officer Aragon. We also **AFFIRM** the grant of summary motion as it applies to Commerce City on the ground that the Cordovas have not created a genuine issue of material fact as to whether a policy or custom of the city was the moving force behind any violation that might have occurred.

08-1222, *Cordova v. Aragon*

**O'BRIEN**, J., concurring in part and dissenting in part.

The majority concludes Derek Aragon is entitled to qualified immunity because the law it announces today was not clearly established at the time of these events and the municipality is entitled to summary judgment. I agree, but can go no further. The law now established for this Circuit, taken without regard to the facts of this case, is reasonable enough, and benign—"the general risks created by a motorist's fleeing from the police are [not], without more, enough to justify a shooting that is nearly certain to cause that suspect's death." (Majority Op. at 14.) But even the newly minted rule cannot reasonably lead one to conclude a constitutional violation occurred here.

The majority repeatedly emphasizes that Aragon shot Toby Cordova in the back of the head. It makes it sound like an execution. Certainly that is what Cordova's survivors would have us believe. But, as I will demonstrate, the record tells a quite different story. Aragon needed to stop a dangerous man astride eight tons of machinery[3] and exhibiting evil intent. That man, Cordova, had repeatedly demonstrated a callous willingness to endanger others rather than submit to police authority.

---

[3] Often called a "dually," trucks such as Cordova's normally weigh over two tons. Cordova's truck, a 1990 Chevrolet K3500 Extended Cab, weighs over 5,000 pounds. *http://autos.msn.com/research/vip/spec_Exterior.aspx?year=1990&make=Chevrolet&model=C/K%203500&trimid=-1*. It was pulling a trailer hauling a skid-steer loader, a piece of construction equipment. The model involved here, a Takeuchi TL150 loader, has an operating weight of 10,902 pounds. *See http://www.takeuchi-us.com/TL150.html*.

Aragon fired five shots—<u>all shots were fired in one second or less</u>—the first bullet entered through the windshield and three others entered the side windows of Cordova's truck as it hurtled past Aragon; there was no accounting for the fifth. If the first shot was justified, as it clearly was, all shots were justified—that the fatal shot was the last or came from an oblique angle is of no moment. This was not gentlemen's boxing, governed by the Marquis of Queensberry rules. And Aragon was not trying to frighten Cordova into submission, an unlikely prospect in the penetrating light of recent events. Aragon was trying to put an end to an obviously dangerous situation.[4] Such being the case, an officer cannot be expected to shoot, pause to evaluate the effect, and then calmly decide whether it is necessary or prudent to shoot again. That is a lot to do in one second under extreme conditions. The only question we need address is whether, in the instant it was made, Aragon's decision to use deadly force was reasonable. We need not parse the details occurring within one second after the first trigger pull. The shots came of urgent necessity and great fear. Aragon was justified in opposing the deadly force bearing down upon him with equal force. His decision to use deadly force was reasonable under these circumstances. No constitutional violation occurred here. I dissent from the majority's contrary holding.

## I. Factual Background

As the majority concedes, to decide this case we must "slosh our way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S.

---

[4] "It ain't over till it's over." Yogi Berra.

372, 383 (2007). But the majority has studiously ignored the very facts which justified Aragon's use of force.

In our totality of the circumstances analysis we must consider all uncontested facts and construe genuinely contested material facts in the light most favorable to Cordova. Cordova is also entitled to all inferences reasonably drawn from those facts. It is a tedious process, but at the end of the day (if we do not confuse arguments, allegations and assumptions with facts) there are few contested material facts and those are easily construed in Cordova's favor, although doing so does not salvage plaintiff's case. Sweeping generalizations do not inform this debate; the devil is in the details, which I now relate.

At 12:58 A.M., Officer James Zamora, a Commerce City police officer, noticed a dual-wheeled truck towing a trailer with a skid-steer loader[5] near Chambers Road and 104th Avenue in Commerce City, Colorado. Knowing thefts of construction machinery had recently occurred in the area and considering the oddity of such equipment being hauled at 1:00 A.M., Zamora reported the trailer's license plate number to dispatch. Dispatch reported the trailer's registered address was not in the immediate area so Zamora decided to stop the truck. He activated his vehicle's overhead lights but Cordova, the driver of the truck, refused to stop; instead Cordova continued west on 104th Avenue, running a red light. Zamora's supervising officer ordered Zamora to terminate his pursuit but ordered other officers to respond to the area in hopes of sealing it off.

_____
    [5] The substantial size and weight of Cordova's rig obviously increases stopping distance and decreases maneuverability.

-3-

Zamora stopped, deactivated his overhead lights and watched Cordova proceed down 104th Avenue and through its intersection with Colorado Highway 2. But a train blocked the 104th Avenue escape so Cordova turned into a parking lot and turned off his lights. Zamora saw this and alerted others over police radio at 1:04 A.M. At this time, six separate officers were in the area and became involved in the pursuit: Zamora, Aragon, Nance, Rubino, Douglas and Walkinshaw. Zamora and Rubino drove to the parking lot and attempted to contain Cordova by blocking his exit with their cruisers. They were unsuccessful because Cordova drove at them, nearly hitting both vehicles. Officer Rubino reported Cordova "drove directly at her and [she] felt that [he] was attempting to 'ram' her patrol car." (R. Appellants' App. Vol. II at 268.) Based on Cordova's actions, the officers resumed the pursuit.

After leaving the parking lot, Cordova ran another red light and proceeded north on Colorado Highway 2.[6] Zamora sped ahead of Cordova and attempted to lay "stop sticks"[7] on the road but Cordova went off the road to avoid them. Aragon and Nance (who were traveling in the same vehicle) stationed themselves at the junction of Highway 2 and Interstate 76 (I-76) in order to deploy stop sticks. Their efforts came to naught because Cordova entered eastbound I-76 to avoid their stop sticks. Zamora, who had followed Cordova onto I-76, raced ahead and again prepared to deploy stop sticks just past the interchange with Interstate 470. Aragon and Nance also followed Cordova onto eastbound I-76.

[6] *See* maps, Attachments A & B.

[7] "'Stop sticks' are a device which can be placed across the roadway and used to flatten a vehicle's tires slowly to safely terminate a pursuit." *Scott*, 550 U.S. at 397 n.9 (Stevens, J., dissenting).

Aragon observed "moderate traffic" or more specifically "three or four cars" travelling westbound on I-76.  (R. Appellants' App. Vol. I at 196, 201.)  He "was in fear for the safety of the public . . . ."  (*Id.* at 201.)

Aragon's experience with pursuits included situations where a fleeing suspect crossed into oncoming traffic to escalate the danger and force police to terminate the pursuit.  Based on Cordova's reckless driving and attempts to avoid capture, Aragon feared Cordova would cross the median, endangering other motorists.  Therefore, Aragon and Nance, with their vehicle's emergency lights activated, crossed the median to warn oncoming traffic.  Shortly thereafter, Cordova did just as Aragon feared—he crossed the median just before the location where Zamora had deployed stop sticks.  Cordova did not turn west on I-76 (the direction of normal traffic flow).  Instead he fell in behind Aragon's cruiser.  At this point both Cordova and Aragon were moving in the wrong direction on the westbound lanes of I-76.  Although both lanes were open at that time, Cordova came up behind Aragon's cruiser (within two feet).  Aragon had to accelerate to avoid being hit.  Because there was "plenty of room to get around [our car]" Aragon felt Cordova's near-miss of his vehicle was another attempted ramming.  (*Id*. at 87.)  Aragon sped up to gain enough distance to warn other motorists and allow a safe deployment of stop sticks across the westbound lanes.  Aragon believed Cordova was acting in an "extremely dangerous" manner and using his truck as a "deadly weapon."  (*Id.*)  Aragon stopped approximately ¾ of a mile later, blocking the westbound lanes with his car.[8]  Nance exited the vehicle

---

[8] There is no dispute as to whether Aragon's vehicle blocked the westbound lanes; the only dispute is whether the car was facing the entrance ramp or the median.

(continued...)

-5-

and went into the median.  Aragon attempted to lay stop sticks but realized Cordova's vehicle was approaching quickly and was already too close for him to safely do so.

As Cordova neared the police cruiser (and Aragon and Nance) he first drove toward Nance's position in the median.  Nance pulled his weapon and aimed it at Cordova.  Cordova then "made an abrupt turn and swerved" toward Aragon's position heading toward the entrance ramp from 136th Avenue (where he would be going the wrong way on the ramp).  (*Id.* at 82.)  Zamora said Cordova's vehicle "swerved and thrashed about."  (*Id.* at 72.)[9]  Aragon "feared for [his] life" at that moment and believed he "was about to be run over."  (*Id.* at 88.) In response, Aragon fired his weapon five times.  For purposes of summary judgment only, the defendants conceded one bullet entered through the windshield and four through the driver side windows of the truck.  They also conceded, again for purposes of summary judgment only, the fatal bullet was fired from the side of the truck, "after some or all of the truck had passed Officer Aragon."[10]  (*Id.* at 45.)  Aragon stated he fired because he "was in immediate danger . . . about to be run over."  (*Id.* at 88.)  While firing, Aragon felt "in imminent danger of death – of being run down by this large truck."  (*Id.*)  Cordova's truck continued, only

_____

(...continued)
This dispute is immaterial because Aragon was clearly not behind the police vehicle at the time he shot at Cordova.

[7] Zamora was on Eastbound I-76, parallel to Cordova's truck and trailer.

[10] Four of the shots definitively hit Cordova's truck: at least one bullet entered through the windshield, two entered the driver side window, and a fourth entered through the driver side window of the truck's extended cab.  It was not determined whether the fifth shot hit Cordova's truck.

-6-

stopping when it hit a tree. The speedometer was frozen at 50 miles per hour (mph). At 1:14:12 A.M. the police supervisor ordered the pursuit terminated. Five seconds later, at 1:14:17 A.M., Aragon reported shots fired.

The entire chase lasted approximately sixteen minutes and covered about eight miles of county, state, and interstate highways.[11] The last portion of the chase occurred on a section of I-76 approximately four miles long.[12] Assuming Cordova's truck was traveling 40 mph,[13] the chase on I-76 lasted approximately six minutes.

None of the above facts are disputed (except the minor fact noted in footnote 11), but there are other disputed facts, which weigh in Cordova's favor, albeit only slightly. I accept them as true. One relates to the distance Aragon was from Cordova's truck at the time Aragon fired his weapon. Aragon's statements in an interview have the truck at a distance of "10, 15 feet" or "probably five, seven feet if that." (*Id*. at 204-05.) Cordova's expert calculated

---

[11] Attachment A is a map showing the path of the entire chase with markers depicting the points at which significant events occurred.

[12] Attachment B is a closer look at the portion of I-76 on which the chase occurred, again with markers depicting the points at which significant events occurred.

[13] The majority's use of 30 mph comes from a description of speeds in the initial stages of the pursuit on 104th Avenue. Cordova was travelling faster in the last seconds before his final encounter with Aragon. Nance said in his police interview Cordova was going "[f]orty" or "[m]aybe 50" miles per hour during the chase on I-76. (R. Appellants' App. Vol. I at 237.) Aragon's estimate was about the same in his sworn affidavit. But in another interview, he stated: "[Cordova was going] probably 50, maybe 60" miles per hour on I-76. (*Id*. at 202; *see also id*. at 88 ("As the truck came toward me, traveling at around 50 or 60 miles an hour . . . .").) For these purposes the lower estimated speed of 40 miles per hour is used because it most favors Cordova.

-7-

Aragon to be at least 13 feet from the path of Cordova's vehicle. I accept the version related by Cordova's expert.

There is also a very minor discrepancy regarding the time between the first and last shot. It could be as little as .75 seconds or as much as 1.03 seconds; hardly a matter of constitutional significance.[14]

## II. Constitutional Analysis

Excessive force claims are analyzed under the Fourth Amendment's objective reasonableness standard, *Graham v. Connor*, 490 U.S. 386, 388 (1989), informed by the totality of the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citation and quotations omitted).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment.") (citation and quotations omitted). "The calculus of

---

[14] Cordova's expert's calculations assume his truck travelled 60.5 feet between the first and fatal shot (at 55 mph). This would mean all four shots were taken in .75 seconds. Assuming Cordova was travelling 40 mph, or 58.66 feet-per-second (fps), 1.03 seconds passed between the first and last shot.

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The majority concludes Aragon's conduct in shooting Cordova was unreasonable because Aragon was not in immediate danger at the moment of the fatal shot and the risk Cordova posed to the general public did not justify the use of deadly force. That is easy to say from the ivory tower years after the fact. In any event, the facts do not support either conclusion.

A. Threat to Aragon

The district court concluded the danger to the public justified Aragon's acts, therefore no constitutional violation occurred. It went on to say disputed facts clouded the issue as to whether Aragon was in immediate danger at the time of the shooting. Therefore, construing the facts in the light most favorable to Cordova,[15] it assumed Aragon was not in immediate danger at the time of the shooting. With no analysis the majority accepts that assumption. We may affirm on any basis supported by the record, even though not relied on by the district court. *Felix v. Lucent Techs., Inc.*, 387 F.3d 1146, 1163 n.17 (10th Cir. 2004). We should do so here by critically evaluating the danger to Aragon. That danger, as well as danger to the public, justifies the shooting.

We review *de novo* a district court's summary judgment decision. *See Smith v. Maschner,* 899 F.2d 940, 942 (10th Cir. 1990). In doing so, we apply the same standard as that used by the district court and examine the record to

---

[15] The district court went overboard. It construed more than facts and inferences favorably to Cordova. We need not repeat that mistake.

determine whether there are genuine disputes as to material facts and whether the prevailing party was entitled to judgment as a matter of law. *Id.* at 942-43. No facts are "found" in a summary judgment and the district court's analysis and conclusions are entitled to no deference. While we view the historical facts in the light most favorable to the non-moving party, in this case Cordova, we do not equate argument and allegations with fact. *Lawmaster v. Ward*, 125 F.3d 1341, 1349 (10th Cir. 1997). The plaintiff, who has the burden of proof in qualified immunity cases, must show a <u>genuine</u> dispute regarding a <u>material</u> fact before we construe that fact in his favor. *Scott*, 550 U.S. at 380. "Where the record taken as a whole could not lead a rational trier of fact to find for the [party claiming injury], there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations omitted). "[M]etaphysical doubt as to the material facts" is not enough. *Id.* at 586.

In examining the undisputed facts of this case, it is clear Aragon felt his life was in immediate danger at the time of the shooting, as would any reasonable officer in the same circumstances. Aragon's words make the case. Neither the words he used nor the facts related are controverted in this record. As he was debriefed by his supervising officer at the scene, Aragon was "visibly shaken and his voice cracked." (R. Appellants' App. Vol. II at 270.) Aragon told his supervisor, "I felt it when [Cordova] passed by me," which the supervisor interpreted as meaning Aragon felt the wind disruption created by the truck as it passed. (*Id.*) In the police department investigation interview just hours after the shooting, Aragon stated:

> I saw him come straight at me . . . . I feared, feared for my life at that point. Uh drop the stop sticks where they were and uh deployed my hand gun at that point . . . . [W]hen he's . . . coming straight at me . . . . I think I am going to be a hood ornament to this big truck . . . . I just didn't feel like I had any other option at that point.

(R. Appellants' App. Vol. I at 203, 205, 207.) Finally, in a sworn affidavit, he recounted the final seconds of the incident:

> I realized that the truck was too close [to deploy the stop sticks]. It was bearing down on me, and I feared for my life . . . . I thought he was going to run me down. I thought I was about to become a hood ornament on this truck . . . . [T]he truck turned and was coming straight at me . . . . Knowing that I was in immediate danger, that I was about to be run over, I fired my weapon . . . . While I was firing my firearm at the vehicle, I felt that I was in imminent danger of death – of being run down by this large truck. I stopped firing when I perceived that the danger had abated. I fired all of the rounds at the truck in one or two seconds.

(*Id.* at 88.)

The majority concludes Aragon was not in imminent harm or death because Cordova's truck had already passed him when he fired the fatal shot. While the defendants conceded for purposes of summary judgment that all or part of the truck had passed Aragon, two telling facts remain undisputed—one second, or less, passed between the first and final shot and the first shot entered the windshield, not the driver side window. The shots cannot be parsed in slow motion but must be considered as an integrated whole. No officer could recognize within one second and in the midst of a violent confrontation that the danger prompting the use of force had totally abated. Cordova's massive truck and loaded trailer passed so close Aragon "felt it when [Cordova] passed by."

-11-

(*Id*. at 220.)  As I said in the introduction, if the first shot was justified they all were justified.  The only issue requiring resolution is whether, in the instant it was made, Aragon's decision to use deadly force was reasonable.  No fact, inference, or combination thereof available in this record can reasonably lead one to conclude Aragon's split-second decision was unreasonable.  That is especially true if, as required, we judge the "particular use of force [] from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  The majority is simply wrong in saying "whatever danger [Aragon] might have perceived had passed by the time he fired the fatal shot."  (Majority Op. at 5.)

The majority also departs from the required totality of the circumstances analysis, *see Garner*, 471 U.S. at 8-9; *Lawmaster*, 125 F.3d at 1349, by disregarding dramatic events leading up to the shooting and in failing to balance the equities.  *See Scott*, 550 U.S. at 383-84 (stating it is appropriate to take into account not only the individuals whose lives are at danger but their relative culpability in creating that danger).  *Scott* held there is a difference between ramming a car and shooting at the fleeing suspect but recognized the appropriate level of force necessary to end a pursuit will always be tied to the level of danger the suspect has created.  *Id.* at 383-84 & n.10 ("Culpability *is* relevant, however, to the *reasonableness* of the seizure – to whether preventing possible harm to the innocent justifies exposing to possible harm the person threatening them.").

-12-

Without doubt shooting at Cordova placed him in grave danger. On the other hand, he used his eight-ton rig to lead a number of officers on a 16-minute chase on public roadways, disregarded traffic laws, attempted to ram Rubino's car, drove on and off the road to avoid capture, endangered the lives of Aragon and Nance by attempting to ram their police cruiser, drove at Nance until a weapon was aimed at him, and then drove at Aragon. Collectively, if not individually, those events would lead any reasonable officer in Aragon's position to believe he was in imminent danger, the public was at risk and that risk was immediate, if not imminent. Cordova, alone, was responsible for the level of danger that led to his death. In spite of numerous opportunities to simply stop his truck and submit to the authority of the police he continued to use eight tons of mass in an attempt to bull his way out of trouble.

Cordova alleges and argues that any threat to Aragon was a creation of his own making. With minimal analysis the majority accepts his argument as fact. It is not a fact and it is not a reasonable conclusion flowing from actual facts.

"The reasonableness of Defendants' actions depends both on whether the officers were in danger at the precise moment that they used force and on whether Defendants' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995). The record is clear Aragon did not voluntarily place himself in the path of Cordova's truck. He neither forced Cordova to drive at him

-13-

nor jumped into Cordova's path. Rather, Cordova purposely and voluntarily "swerved," or "made an abrupt turn," in Aragon's direction. (R. Appellants' App. Vol. I at 72 (Zamora stating: "[T]he truck . . . swerved and thrashed about . . . ."), 82 (Nance stating: "The truck then made an abrupt turn and swerved . . . .").) It was Cordova, not Aragon, who created the need for deadly force.

While Aragon may have mistakenly believed he could safely deploy the stop sticks and perhaps did not allow himself enough time to safely do so, the qualified immunity standard "gives ample room for mistaken judgments," protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986); *see also Pearson v. Callahan*, --U.S.--, 129 S. Ct. 808, 815 (2009) (the protection of qualified immunity extends to reasonable mistakes of law, fact, or a combination thereof). Aragon's mistaken judgment (if that it be) and his resulting vulnerability does not make him responsible for the threat Cordova deliberately posed to him, other officers, and the general public.

An officer may not purposely place himself in harm's way to justify a seizure, but an officer need not avoid a confrontation at all costs. *See Scott*, 550 U.S. at 385-86 (police are not obliged to call off a pursuit simply because the pursuit may endanger others). Aragon was not required to dive out of the way to avoid a confrontation caused by Cordova. In *Sevier*, three officers approached an allegedly suicidal individual who had threatened no harm to anyone but himself.

-14-

60 F.3d at 698. In response to the officers' provocation, the individual lunged at an officer and was shot. *Id.* The district court determined the officers were not entitled to summary judgment on qualified immunity grounds because genuine issues of material facts remained in dispute. *Id.* at 699. While we concluded we lacked jurisdiction over the officers' appeal, we observed the record revealed some evidence upon which a jury could conclude that the officers acted recklessly by confronting the victim in the manner they did knowing he was armed and distraught and without gathering more information on the situation. *Id.* at 700, 701 n.10. Conversely, in *Jiron v. City of Lakewood*, we affirmed a grant of qualified immunity to a police officer who confronted a felony suspect attempting escape from a closed room with a deadly weapon in hand. 392 F.3d 410, 418 (10th Cir. 2004). We held the officer did not exhibit reckless behavior by entering the room because avoiding the confrontation "risked the escape of an armed and agitated suspect into the public and risked a potentially more violent confrontation." *Id. Jiron* distinguished *Sevier* where a suicidal person posed no threat to others while in a confined area. *Id.* at 419. Like the facts of *Jiron*, Aragon reasonably stood his ground against a fleeing suspect using deadly force against him and who had previously shown a propensity to risk harm to others.

B. Threat to the General Public

-15-

Would the public have been better served had Aragon simply let Cordova again escape?[16] The Supreme Court has said "no" in similar circumstances. "We think the police need not have taken that chance [injury to the suspect or others] and hoped for the best." *Scott*, 550 U.S. at 385. The majority is, of course, correct in weighing the risks of harm to Cordova against the risk of harm to the public (in addition to the risk of imminent harm to Aragon). Part of the inquiry must be the immediacy and probability of harm. *See id.* at 384 ("[I]t is clear . . . respondent posed an actual and imminent threat . . . ."); *see also Graham*, 490 U.S. at 396 ("the test of reasonableness . . . requires careful attention to the facts . . . including . . . whether the suspect poses an immediate threat to the safety of the officers or others" and "whether he is actively resisting arrest or attempting to evade arrest"). But there is even more to the test, including but not limited to the urgency of the situation, the risk to the police, the alternatives available, and the relative culpability of the actors. *Scott*, 550 U.S. at 384; *Graham*, 490 U.S. at 396. The risk to Cordova was, of course, extreme. Shooting at someone, as *Scott* points out, is a great deal different from ramming their vehicle. *Scott*, 550 U.S. at 383. But *Scott* is not the most analogous application of deadly force the Supreme Court has recently considered. Another shooting begs consideration.

In *Brosseau v. Haugen*, a police officer, engaged in the pursuit of a fleeing suspect, watched him get into a parked vehicle. 543 U.S. 194, 196 (2004). She

---

[14] He earlier escaped containment in the parking lot.

repeatedly ordered him to exit the vehicle and briefly engaged in a struggle with him (where she broke the vehicle's window and hit him in the head with the butt of her handgun). *Id.* When he started the vehicle and began pulling away, the officer shot him in the back. *Id.* at 196-97. She was never in the path of the vehicle, had no knowledge of any individuals who were or had been endangered by the vehicle, and was aware of no imminent threat to others should he be permitted to flee. Nevertheless, she shot him. *Id.* at 197. Officer Brosseau said her use of force was grounded in a fear "for the other officers on foot who she believed were in the immediate area, and for the occupied vehicles in [the suspect's] path and for any other citizens who might be in the area." *Id.* (quotations omitted). The Ninth Circuit reversed a grant of summary judgment, finding a constitutional violation was clearly established by *Garner* and *Graham*. *See Haugen v. Brosseau*, 339 F.3d 857, 874 (9th Cir. 2003). The Supreme Court reversed on narrow grounds. 543 U.S. at 201. The case is more important for what it did not say than for what it did say. The Court did not say shooting a fleeing suspect in the back without being able to identify a single person who could have reasonably been in danger was a constitutional violation. Instead, it said *Garner* (involving a youth running away and clearly posing no danger to anyone) and *Graham* did not clearly establish the law. *Id.* at 199. The Court held Brosseau's fears for the safety of people who may, or may not, have been in the area shifted her actions into the "hazy border between excessive and acceptable

-17-

force," and therefore her actions were not a clearly established constitutional violation. *Id.* at 201 (quotations omitted).

Officer Brosseau's fears for the safety of others were neither as well articulated nor immediate as Aragon's. He experienced firsthand being in the path of Cordova's truck, knew of other attempted rammings, personally observed Cordova's dangerous driving on and off the road, and saw other vehicles on I-76.[17] The majority should have followed the lead of the Supreme Court and stopped with a holding of no violation of clearly established law. We are now unnecessarily committed to a contrary, and in my view, erroneous path.

The majority minimizes the risk Cordova posed to other drivers, saying there were "[no] other motorists . . . in the vicinity" and Cordova's actions were "general dangers" which posed a "risk of future harm [that] was not enough to justify the near certainty of Mr. Cordova's death." (Majority Op. at 13.) Case

---

[15] In footnote 6 the majority faults me for mentioning the other vehicles on westbound I-76 (*supra* at 4) claiming they were not referenced in the briefs and we are not obligated to scour the record in search of facts. We may not be obligated to scour the record in order to fairly decide a case, but we are not prohibited from doing so. Aragon referred to other vehicles several times, not just once. I was alerted to his statements from a record cite in Cordova's opening brief where he discusses Aragon's reason for crossing the median of I-76. (Appellant's Br. at 8.) The district court said a jury could find Aragon's testimony untrustworthy, but we are not bound by that unsupported and improper conclusion. The district court heard no evidence and could make no findings (certainly not credibility findings); it looked at the same record we do. The presence of other vehicles on I-76 is nowhere contradicted in the record and there is no objective reason to discredit Aragon's statements about them. Contrary to the majority's assertions, we must accept uncontroverted facts even if they are inconvenient — there were other vehicles on westbound I-76. The majority does not simply construe the factual record in Cordova's favor, it assumes facts favorable to his position (and its conclusions).

-18-

law does not require the threat to the general public be immediately recognizable. *Garner* said use of deadly force is warranted to prevent escape if the police officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 11. The Court did not require immediacy of a threat to non-officers. *Scott* affirmed this notion when it rejected the injured motorist's suggestion that an immediate threat of harm was one of the preconditions set forth in *Garner*. *See Scott*, 550 U.S. at 381-82 ("*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.' [It] was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation.") (citation omitted). In *Scott*, the police rammed the individual to avoid speculative future injury to other individuals on the road. The majority described the pursuit as a "Hollywood-style car chase of the most frightening sort" which placed police and bystanders at great risk of serious injury. *Id.* at 380. However, the dissent saw it much differently, saying "no pedestrians, parked cars, sidewalks, or residences were visible at any time," the suspect never lost control of his vehicle, and even "slowed and waited for the cars traveling in the other direction to pass before overtaking the car in front of him while using his turn signal to do so." *Id.* at 392-93 (Stevens, J. dissenting). The majority determined the risk of letting a suspect flee into the night because his actions were reckless would create more

-19-

reckless driving by suspects who would know escape was within reach. *Id.* at 385-86; *see also Brosseau*, 543 U.S. at 198 (expressly declining to consider use of deadly force as a constitutional violation).

Like the future danger recognized in *Scott*, Cordova's significant risk of future reckless behavior and dangerousness justified immediate action. Regardless of the justification provided by the imminent threat to Officer Aragon, the threat Cordova posed to the general public also provided an independent justification for the use of deadly force.

Past behavior is the best predictor of future behavior. Cordova's past behavior, evident on this record, is clear evidence of a wanton disregard for the safety of others. Zamora stated Cordova "was willing to place an officer and the public in danger. The truck had become a deadly weapon." (R. Appellees' Supp. App. at 2.) Rubino "felt [Cordova] had endangered [her] life and was using his vehicle as a deadly weapon." (*Id.* at 3.) To Nance, "it was clear . . . [Cordova] was extremely dangerous and was using his truck as a deadly weapon . . . . I was in fear for my life." (R. Appellants' App. Vol. I at 81-82.) And Aragon said Cordova "was bearing down on me, and I feared for my life . . . . I thought I was about to become a hood ornament on this truck . . . . I felt that I was in imminent danger of death." (*Id.* at 88.) When Aragon crossed the median he was worried about the "safety of the public that was traveling" after seeing "three or four cars"

on I-76 and witnessing firsthand Cordova's dangerous behavior. (*Id.* at 201.) These subjective impressions are fully supported in the record.

Cordova had once broken from confinement (in the parking lot) by aggressive means and was threatening to do so again. The threat Cordova posed to the public was far from hypothetical. Cordova represented a substantial and significant risk to anyone he may have met as he proceeded the wrong way up the I-76 entrance ramp. Apparently no cars were present on the ramp, but Aragon, being otherwise occupied and with his back to the ramp, cannot reasonably be charged with such knowledge. Traffic was light in the early-morning hours, but Aragon saw cars on I-76 during the chase; it was not just speculation for him to conclude a car could be coming down the entrance ramp. But it is quite speculative to assume (as the majority suggests) such a car encountering Cordova's truck with laden trailer would be able to avoid a collision. And other, but more remote, dangers were reasonably within the orbit of risk. If Cordova had again broke confinement and escaped without causing a head on collision on the ramp, his past behavior strongly suggests what he would do if he were to later encounter another police car, even one ignorant of his escapades.

Cordova posed "a threat of serious physical harm, either to the officer or others," which fully justified Aragon "to prevent escape by using deadly force." *Weigel v. Broad*, 544 F.3d 1143, 1152 (10th Cir. 2008), *cert. denied*, No. 08-1128, 2009 WL 631116 (May 18, 2009) (quotations omitted). Certainly he posed

-21-

more than a "general danger[]." (Majority Op. at 13.) The threat Cordova posed to the public was considerably more evident, more immediate, and more serious than that presented to Officer Brosseau, who shot a fleeing suspect from behind before his vehicle even moved. Her act, motivated by fear for other police officers, occupied vehicles, and even individuals she did not know existed was not determined to be a constitutional violation *Brosseau*, 543 U.S. at 197. Aragon's less egregious acts deserve no harsher treatment.

There was no constitutional violation here. I would affirm the judgment of the district court so holding. The district court also entered summary judgment in favor of the Commerce City Police Department because Aragon committed no constitutional violation. I would affirm that decision as well, for the same reason. *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986)).

I join the majority in holding 1) Aragon's acts violated no clearly established law and 2) the Commerce City Police Department is entitled to summary judgment. From all else, I dissent.

ATTACHMENT "A"

A.    Initial pursuit begins

B.    Cordova attempts to ram Rubino
      when exiting parking lot; second
      pursuit begins

C.    Cordova enters eastbound I-76

D.    Zamora lays stop sticks; Aragon and
      Cordova cross the median onto
      westbound I-76

E.    Aragon shoots Cordova

ATTACHMENT "A"

ATTACHMENT "B"

C.  Cordova avoids stop sticks by entering eastbound I-76

D.  Zamora deploys stop sticks; Aragon crosses median followed by Cordova – both proceed against traffic on westbound I-76

E.  Aragon and Nance exit vehicle; Cordova drives first towards Nance in the median and then turns toward Aragon on the west side of the entrance ramp from 136th Avenue

ATTACHMENT "B"